HARRY W. HILL, Guardian, Appellee, v. IGNATZ VICTORA et al., Appellants.

CARL VICTORA et al., Appellants, v. IGNATZ VICTORA et al., Appellees.

**DIVORCE:** Abatement of Action—Death—Reopening Proceedings.
1 Principle recognized that, while a divorce proceeding is abated by the death of the defendant, yet it may be, upon proper showing, reopened, in so far as it affects property interests.

**COMPROMISE AND SETTLEMENT:** Validity—Fraud—Inability
2 to Understand Language. Evidence reviewed, and held insufficient to set aside and annul, for fraud and misrepresentation, a compromise and settlement of property interests, and decrees entered in accordance therewith, between a wife, husband and stepchildren, even though the wife was unable to read the English language, was not of strong mind, and was easily influenced and imposed upon.

**FRAUD:** Acts Constituting Fraud—Duty to Enlighten Ignorant
3 Person. Principle recognized that one dealing with a person unable to understand or read the language in which an instrument is written, owes the duty to such person to fully apprise such person of the contents and meaning of such paper.

*Appeal from Madison District Court.*—W. H. FAHEY, Judge.

MONDAY, JANUARY 22, 1917.

REHEARING DENIED FRIDAY, JUNE 22, 1917.

THESE proceedings are somewhat complicated, and the issues are involved. The first is an action by the guardian of Barbara Victora to set aside a decree in the case of Barbara Victora v. Ignatz Victora et al., and also a de-

cree in the case of Fred Victora and Carl Victora v. Ignatz Victora and Barbara Victora, and also to set aside the contracts on which said actions were based, because of fraud practiced in obtaining the same, and for other reasons. The first decree sought to be set aside was in an action for a divorce, in which Barbara Victora was plaintiff, and also asked for the protection of her dower interests in certain lands formerly owned by her husband, Ignatz Victora, 'and that a contract and deed made between the husband and his sons, Carl and Fred Victora, be set aside. The second was an action brought by the sons, Carl and Fred, against Ignatz and his wife, Barbara, to re-establish a deed of the lands in controversy made to the said sons, the original deeds, or one of them, having been destroyed at the instance of a brother of Barbara Victora's. All these actions were consolidated and tried together, resulting in a decree setting aside the decrees entered in the original cases, establishing and confirming Barbara Victora's dower interest and distributive share in the real estate, and setting aside the deeds executed by Ignatz and Barbara Victora to John, Carl and Fred Victora. The appeal is from this latter decree.—*Reversed and remanded.*

*F. T. Van Liew* and *W. S. Cooper*, for appellants.

*C. W. Lyon, Wilkinson & Wilkinson,* and *J. W. Rhodes,* for appellees.

DEEMER, J.—I. Barbara Victora commenced an action for divorce against her husband, Ignatz, December 5, 1910, based upon cruel and inhuman treatment. Thereafter, and about September 11, 1911, she filed a supplemental petition, making Fred, Carl and John Victora, sons of Ignatz, and her stepchildren, parties defendant. in which she claimed that these sons, with their father, en

tered into a fraudulent conspiracy to defraud the wife out of her inheritable interest in her husband's property, and that, pursuant thereto, John Victora commenced an action against his father to quiet title to certain lands, the title to which then stood in the father's name; that the father appeared to said action, filed an answer admitting that title should be quieted in the plaintiff therein; that Carl and Fred Victora commenced another action against plaintiff and their father to quiet title to certain real estate in Madison County, to which the father appeared and practically admitted the allegations of the petition, and thereafter, John Victora commenced an action against both Ignatz and Barbara Victora, claiming that they owed him the sum of $7,000, for which he asked judgment, to which action Ignatz appeared and filed an answer, admitting the indebtedness. Barbara appeared and filed answer.

After these actions were commenced, with fraudulent motive and purposes, it is claimed, it is averred that Ignatz and his three sons got together, induced Barbara to go to Des Moines with them, and, in the absence of her attorney, fraudulently and corruptly induced Barbara to sign a pretended agreement of settlement, which, in effect, deprived her of all rights in and to her husband's property. It is claimed that Barbara could not understand the English language, did not know what was in the agreement of settlement, but believed that it protected her rights, because the parties represented to her that it would; and that they further stated that, unless she signed the agreement, the lawyers would get all the property and leave them all without anything. A subsequent stipulation was entered in January of the year 1912. This stipulation was carried into a decree, and it provided for the confirmation of a deed made by Ignatz and his wife to John Victora for certain lands in Adair County, and for the con-

firmation of another deed theretofore made by Ignatz Victora and his wife to Carl and Fred Victora for certain lands in Madison County, and for the conveyance by Ignatz to his wife, Barbara, of a house and lot in Earlham, the grantee therein to immediately reconvey the same to Ignatz's six children, reserving, however, to the grantor, Barbara, a life estate in said house and lot. The decree entered on the stipulation also provided that, if Barbara survived her husband, John, Carl and Fred Victora should pay to Barbara the sum of $1,000. It was provided in the deeds which were confirmed that John, the grantee in the first one, should pay to Ignatz and Barbara, during the lives of either of them, the sum of $180 annually, and that Carl and Fred should pay to Ignatz and Barbara, or the survivor, $310.50 annually thereafter. These payments were to commence on December 1, 1911. Provision was also made for the payment of Barbara's attorney's fees. It was also provided, in effect, that the divorce proceedings against Ignatz should be dismissed; that they should live together thereafter; and that Barbara should have no interest in the real estate conveyed, save the life estate in the Earlham property, and perhaps a lien upon the lands for the annuities provided in the deeds. This decree was entered February 6, 1912, and the divorce action was subsequently dismissed. Barbara Victora seems to have been represented by counsel at the time this consent decree was entered, and their fees were provided for in this decree. The decree was entered in a case entitled Barbara Victora, Plaintiff, v. Ignatz Victora, Defendant; John Victora, Carl Victora and Fred Victora, Defendants and Interveners.

Before the commencement of the divorce suit, and on November 14, 1910, Carl and Fred Victora commenced an action against Ignatz and Barbara Victora, in the Madison County District Court, to re-establish a deed made

by Ignatz and his wife, Barbara Victora, to them on or
about September 9, 1910, covering certain lands in Madi-
son County, which deed, it is claimed, after delivery in
escrow, was wrongfully obtained by Ignatz and his wife
from the depository some two weeks after its delivery,
and destroyed by them. It is also averred that, by false
and fraudulent representations, they induced Carl Victora
to believe that the deed had no force and effect. Carl and
Fred asked that this deed be re-established, alleging that it
was based upon a sufficient consideration, and was wrong-
fully and fraudulently destroyed. Defendant Ignatz ap-
peared in that action by attorney, and filed an answer prac-
tically admitting the allegations of the petition, and it is
this answer which is referred to in the action commenced
by Barbara. Barbara appeared, September 8, 1911, and
filed an answer and cross-petition, in which she pleaded
that the original deed was obtained through fraud and
misrepresentation regarding the nature and object of the
same, and she denied all other allegations of the petition.
She also filed a cross-petition, in which she pleaded her
marriage to Ignatz in the year 1890, possessed of lands
in Madison and Adair Counties, worth about $35,000; and
that thereafter, the plaintiffs in the action, by fraud and
misrepresentation, secured the execution of the deed to
them, and she asked that the deed be set aside. In a
reply to this cross-petition, it was alleged that, since the
filing of Barbara's answer and cross-petition, Ignatz Vic-
tora had died, and Barbara had been adjudged of unsound
mind. They also denied the allegations of the cross-peti-
tion, and further pleaded the decree entered pursuant to
the stipulation in the original divorce proceeding, confirm-
ing the deed, as hereinbefore recited.

　　Under these issues, a decree was entered in the action
commenced by Carl and Fred, confirming their title to
the Madison County land, subject to the liens, etc., referred

to in the decree in the original divorce case. Thereafter, and on April 20, 1914, Harry Hill, as guardian for Barbara Victora, who had been adjudged of unsound mind, filed a petition in the case brought originally by Carl and Fred Victora against Ignatz and his wife, to set aside the decree therein, and also the decree in the case brought by Barbara v. Ignatz Victora and John, Fred and Carl Victora, and the deeds referred to therein, because each and all were obtained by fraud. Thereafter, he filed an amended and substituted petition to vacate and set aside the judgment and decree in the action brought by the sons against their parents, and the deeds therein referred to, for fraud, etc., and on the same day, he filed a like petition in the action brought by Barbara Victora against her husband and his sons, this, too, being based on fraud and misrepresentation. A motion was also filed to set aside the order of dismissal of the original divorce action. Issue was taken upon these petitions and the motion, and a trial had to the court, all of the actions being consolidated and tried together; and a decree was finally entered, granting the petition to set aside and vacate the judgments, and the deeds referred to therein to John and to Fred and Carl Victora were set aside, and Barbara's dower interest or distributive share in all of the real estate was established and confirmed, and she was given a one-third interest in all the property, including the house and lot in Earlham. John, Carl and Fred Victora appeal.

II. It has seemed necessary to set out these voluminous pleadings and proceedings, in order that the matters at issue may be better understood.

As has been observed, Ignatz Victora is now dead, and, if he died seized of any property, his widow is entitled to her distributive share therein. The widow is now under guardianship, having been adjudged insane

1. DIVORCE: abatement of action: death: reopening proceedings.

in February, 1914, and she is represented by Harry W. Hill as guardian. It is manifest that the original divorce proceeding has abated by the death of Ignatz, but it may be reopened, in so far as it affects property rights, upon a proper showing. It also appears without dispute that, on the 9th day of September, 1910, what purports to be a warranty deed was made by Ignatz and Barbara Victora to Carl and Fred Victora to certain lands in Dallas County, Iowa, the deed reciting a consideration of $1 and other valuable consideration. This deed does not seem to have been filed for record, and, as will subsequently appear, it was destroyed. Again, it appears that the same grantors, on the same day, to wit, September 9, 1910, made a deed to John Victora for land in Adair County, in consideration of $1 and other valuable considerations. This deed was filed for record September 20, 1910. In the deed first mentioned, the grantees agreed to pay the grantors or the survivor of them $310.50 annually, commencing December 1, 1911. The grantees were also to pay a sister, upon the death of their father, the sum of $1,000, and the grantors were to have the use of the dwelling house upon the land during their lives or the life of either. In the second deed mentioned, the grantees agreed to pay the grantors or the survivor the sum of $180 per annum. Each deed provided that it was accepted by the grantees as their share in the estate of the grantors, or either of them. It will also be observed that, in the consent decrees entered in the two original actions, these deeds were confirmed, and the decree, in addition to the annuities provided in the deeds, provided that, within six months after the death of Ignatz Victora, John, Fred and Carl Victora should pay to Barbara the sum of $1,000; she was also allowed what was, in effect, a life estate in the house and lot in Earlham, the remainder going to all of Ignatz Victora's children, six in number. The record further shows a quitclaim deed made by Ignatz

and Barbara Victora to John Victora of the land in Adair County, which was recorded May 25, 1911, and another deed of the same character, made by Barbara Victora to the six children of Ignatz, for the house and lot in Earlham, reserving a life estate to the grantor. This deed, having been made January 22d and recorded February 6, 1912, was also confirmed.

The record also shows a written memorandum of agreement made and entered into between Barbara Victora and Ignatz Victora, of date January 19, 1912, which reads as follows:

### "MEMORANDA OF AGREEMENT.

"It is hereby stipulated by and between Barbara Victora and Ignatz Victora, plaintiff and defendant respectively, in the case entitled Barbara Victora vs. Ignatz Victora, now pending in the district court of Madison County, Iowa, as follows, to wit: That whereas, the parties hereto are desirous of settling all differences and all litigation now pending between the parties hereto or the children of Ignatz Victora, and whereas, the parties hereto desire to re-establish themselves as husband and wife, and live together as such, witnesseth:

"Par. 1. That, in consideration of the defendant, Ignatz Victora, deeding to the plaintiff, Barbara Victora, all his right, title, and interest to certain premises owned by him in the town of Earlham, Madison County, Iowa, during her lifetime, said property upon the death of Barbara Victora to revert to the surviving heirs of Ignatz Victora, it being understood and agreed that the said Barbara Victora is to have the rents and profits accruing upon said property during her lifetime, she retaining only a life interest in and to said premises.

"Par. 2. In further consideration that, in the decree entered in the above entitled cause or causes, the plaintiff,

Barbara Victora, be awarded, as her one-third interest in and to the farm situated in Madison County, Iowa, now occupied by the defendant, Ignatz Victora, and Carl and Fred Victora, and the farm situated in Adair County, Iowa, and now occupied by John Victora, said $1,000 to be paid by the owners of said farms to said Barbara Victora within 6 months after the death of said Ignatz Victora; provided, however, that, in the event that said Barbara Victora does not survive Ignatz Victora, then and in that event the lien herein referred to shall be discharged and released.

"Par. 3. It is hereby further stipulated and agreed that the defendant Ignatz Victora shall pay all court costs in the litigation herein referred to, and pay plaintiff's attorneys the sum of $500; and to pay Mrs. Janda of Des Moines, Iowa, $32 for board and room of Mrs. Victora during her stay with Mrs. Janda; and to Mr. Frank Meleneck, $5 for services as interpreter on January 19, 1912, said sums to be paid out of the moneys now in the possession of the clerk of the district court of Madison County, Iowa, the balance of said moneys in the possession of the clerk of the district court of Madison County, Iowa, to be turned over to Ignatz Victora; also Ignatz Victora is to be given the moneys now deposited to Barbara Victora's credit in the Citizen's State Bank at Earlham, Iowa.

"It is further understood and agreed that nothing herein contained shall in any manner affect the provisions in the deeds heretofore given to John Victora, Fred Victora, and Carl Victora by Ignatz Victora and Barbara Victora.

"In consideration of the above and foregoing, the plaintiff, Barbara Victora, hereby agrees to dismiss any pending litigation which she may have against this defendant."

This is the stipulation which was carried into effect in the decree which it is sought to set aside.

It is manifest that, to sustain the decree from which this appeal was taken, it must be found that, from the be-

ginning, John, Fred and Carl Victora have acted fraudulently, and thereby and by false and fraudulent misrepresentations induced Barbara Victora to sign the contracts, agreements and deed hereinbefore referred to, or that she (Barbara) was of unsound mind at the time these transactions took place, or of such weakness of mind as to be easily imposed upon, and that, taking advantage thereof, John, Fred and Carl Victora, together with her husband, unduly influenced her into making these different instruments and into agreeing to the consent decree against her will. These things must be established by at least a fair preponderance of the testimony. Indeed, the rule is somewhat stronger than this, where fraud is the gravamen of the charge.

It should also be stated that the original deed to Fred and Carl Victora was destroyed in the manner hereinafter indicated, and that the final settlement of the case was had with the consent of counsel for Barbara Victora, and the final decree entered upon that settlement was prepared and presented to the court by her counsel.

III. Coming now to the facts bearing upon the crucial issues of the case, we find that Ignatz and Barbara Victora were married in July, 1890. They were each born in Bohemia, and Barbara was unable to speak the English language, and could not read or write any language. Ignatz had been married before, and by that marriage had six children, the eldest being 17 and the youngest less than 3 years of age, at the time of the second marriage. These children were Joseph, John, Carl, Fred, Emma and Rose, the two latter being now married. Barbara performed her duties as wife and stepmother to these children down until the time the difficulties arose, of which we shall presently speak. She was industrious, a good housekeeper, and neat and cleanly in her habits. She lived

2. COMPROMISE AND SETTLEMENT: validity: fraud: inability to understand language.

with her husband until December of the year 1910, when she commenced the divorce action heretofore mentioned, when a separation took place which lasted until January 12, 1912, when the parties resumed their marital relations and continued to live together as husband and wife until the death of the husband, in December of the year 1913. For the last 10 years, Barbara has been in poor health, and her mind has been somewhat affected. She was extremely nervous, and it is claimed that the trouble she had with her husband and the family unsettled her mind, and that she became what one of the doctors described as a "mental degenerate." Her counsel now say that, by reason of a dangerous injury received some years ago, and a severe attack of typhoid fever, her mind, never strong, became clouded, and that for several years she has been of unsound mind. Counsel do not claim that, at the time the various decrees were entered and transactions had, Barbara was so insane that for this reason alone the deeds, decrees, etc., should be set aside, but they do insist that she was incapable of attending to business matters, save of the simplest character; that she was dependent upon others, sympathetic, easily influenced and imposed upon; and that both her husband and his children, recognizing this fact, took advantage thereof, and fraudulently conspired to rid her of any interest in her husband's property save such as they saw fit to give her.

During the husband's lifetime, and before September, 1910, he acquired 210 acres of land in Dallas County and 120 acres in Adair County, at least 160 acres of which were secured after his second marriage. He also owned a house and lot in Earlham, had considerable stock and money, was not in debt, and, it is claimed, was worth in all at least $50,000 in September, 1910; and it is claimed that about that time the conspiracy was formed to deprive Barbara of any interest she might have in her husband's

property. The testimony tends to show that the wife was easily influenced, and that the deeds hereinbefore referred to, from her husband and herself to the boys, Carl and Fred, and to John, of the Dallas and Adair County lands, were secured from her on the theory and upon the representations of the parties that they were mere leases, and that the boys were to pay rental for the use of the lands. It is claimed that, when she discovered that they were in fact deeds, she employed an attorney, and that, with this attorney and another, or others, she went to the bank where the deed to Carl and Fred had been deposited, secured the possession thereof and had the same destroyed, and that it was then agreed that the deed to John of the Adair County land, which was then in John's possession, should be recalled and destroyed, but that this was never done. Shortly thereafter, and on November 14, 1910, Carl and Fred brought their action to have the destroyed deed reinstated, and to quiet their title to the Dallas County land, and John also commenced a similar action to have his title quieted in the Adair County lands. John, also at the same time, commenced an action to recover from Ignatz and Barbara Victora the sum of $7,000 for work and labor performed by him for the defendants therein named. Notice of these actions was served upon Barbara.

Following these suits, Barbara commenced her action for divorce against Ignatz, which suit was commenced on December 5, 1910. She filed a supplemental petition in that case, as hitherto stated. In their answer to this supplemental petition, John and Fred claimed that Ignatz and Barbara Victora owed them $15,000 for work and labor done. Ignatz appeared and filed answer in the actions brought by his sons Carl and Fred, and by John, in which he admitted practically all the allegations of the petitions; and, after issue joined by Barbara in all of the cases, they were continued.

In March of the year 1911, Joseph Victora, one of the sons, called upon Barbara at a place where she was then visiting, and prevailed upon her to go with him to his home in Adams County, and tried to induce her to return to her own home and to resume her marital relations, and, it is claimed, worked upon her sympathies, and, by various statements as to what would be done to protect her property interests, persuaded her to have the husband come to Joseph's house, and after he arrived there, it is claimed that the father and son induced her to accompany them to Des Moines, there to go to the house of one John Vicker, a' nephew of Ignatz', in order to settle their various controversies. It is further claimed that, after reaching Des Moines, they induced Barbara, by various misrepresentations, to forego the services of her attorney, and saw to it that she did not go to the house of her brother, who also lived in Des Moines, although she asked to go to this brother's house, and also asked that her attorney, who lived in Madison County, be called in. She also wanted her brother to act as interpreter, in order that she might understand the settlement which the father and sons were proposing to make, but they induced her to accept an interpreter of their own selection.

It seems that a contract of settlement had been prepared by someone, and this the husband and his son, with the aid of the interpreter, induced Barbara to sign. They also secured her signature to a dismissal of her suit for divorce, etc. After this was done, Barbara and Joseph visited the woman's attorney at Winterset, but, as they were unable to satisfactorily explain the matter to him, he refused to permit the case to be dismissed at the May, 1911, term of court, and called the attention of the judge to what he thought was an unjust settlement. It seems that Barbara was then or thereafter in court, and the presiding judge, after talking with her through an interpreter,

concluded not to accept the settlement, and he refused to enter an order of dismissal pursuant to the settlement. Later, in January, 1912, the parties in interest, or some of them, induced Barbara to go with them to the office of C. W. Lyon, Esq., an attorney at Des Moines, and there the attorney was told, through an interpreter, what the agreement of settlement was, and he (the attorney) claims that it was stated to him that it was to the effect that Barbara should be secured in her rights by a mortgage of $1,000 on the Madison County farm, and that Barbara should return and live with her husband. With this understanding, it is claimed that her Des Moines attorney, believing it to be his duty not to "step in" between husband and wife, finally consented to any settlement which the parties might make, although he had doubts of the validity thereof, and he drew another contract, which was there signed. Barbara then went home with her husband and continued to live with him.

On February 6, 1912, decrees were entered in the several cases upon the last agreement of settlement. Although, as already remarked, the issues are complicated, the whole case turns upon the question of fraud and misrepresentation. It is not seriously contended that Barbara was wholly *non compos mentis,* but it is claimed that she was of a confiding and trusting nature, very easily imposed upon by her friends, easily misled and of feeble mentality; and that the defendants, taking advantage of these frailties, imposed upon the woman and her counsel, by various promises, misrepresentations and machinations, induced the woman to part with her valuable interest in her husband's property, she at no time understanding the full import thereof.

As Barbara could not speak or understand the English language, and could not read or write any language, it was the duty of the husband and his sons and their attorneys, or representatives, to state the facts regarding the contents, nature and effect of the instruments which they induced her to sign, and, if they failed to do so, this in itself would constitute a fraud. Or if they knew or had good reason to believe that she did not, because of her infirmities, know the effect of the instruments, and, knowing or having good reason to believe that she did not understand the contents, nature or effect of these instruments, led her into signing the stipulations and agreements, on an erroneous supposition as to their nature or effect, this, too, would constitute fraud.

The record is voluminous upon this question, and we shall not set out the testimony bearing thereon. Suffice it to say that, if the case stood alone upon the original deeds and the first settlement of the cases, the latter having been made in March of the year 1911, we would have little difficulty in finding them fraudulent, and that they and all proceedings based thereon should be set aside and the decree below affirmed. But the last settlement, executed in January of the year 1912, stands on an altogether different basis. This was the second time that the parties attempted to adjust their difficulties, and every effort seems to have been made to secure a complete and final adjustment thereof.

Barbara was represented by counsel, and two disinterested persons were present to act as interpreters. Her counsel attempted to procure as favorable terms as possible, although he would not interfere in any way with the reconciliation between husband and wife. The entire transaction was fully explained to Barbara, and she declared that she understood it. Counsel seems to have been

*Margin note:* 5. FRAUD: acts constituting fraud: duty to enlighten ignorant person.

extremely careful, in view of the preceding attempts at settlement, to have his client fully understand the matter, and, although not entirely satisfied with what was being secured for this woman, he concluded that, as she fully understood the terms and was satisfied therewith, and wanted to return to live with her husband and have all prior difficulties settled, he would yield to her wishes. One of Barbara's counsel lived at Winterset and the other at Des Moines, and, as the one at Winterset was not present, but had discouraged, if not disapproved, the prior settlement, counsel at Des Moines, before the matter of final settlement was closed, called up his colleague at Winterset by 'phone, and the two discussed the matter and concluded that the settlement should go through. There was no fraud whatever in this transaction. Every effort was made to acquaint Barbara with the terms of the agreement, and it was her fault if she did not understand it. She received the money agreed to be paid her under the settlement, and she and her husband also saw to it that the attorneys' fees were all paid. Barbara returned with her husband to their home, and they resided there until the death of the husband. They received their annuities until the death of the husband, and since that, these annuities have been paid, or offered, to the widow. None of the money paid under this last settlement has ever been returned by Barbara, nor has there been any offer of return. The most that can be said under the testimony is that Barbara got a mistaken notion in some way that she was to be paid $9,000. No one claims that any such statement was made to her, unless it was made by her own interpreter. If such statement was made, it was not induced by anything said by the other parties in interest during this settlement.

There is no claim that any party in interest made any false and fraudulent statements at this time, and none of

them knew that any were being made to Barbara. Her counsel was present, and he was more watchful that he might ordinarily have been, because of a prior settlement made when his client did not have the aid of counsel; and both her attorneys thought that there was no reason why their client should not enter into the stipulation.. This stipulation and the final decree itself were draughted by Barbara's counsel in his own office after the matter had been fully talked over and discussed, and counsel had secured all the concessions which his client had demanded, and perhaps a little more, and, after the stipulation was prepared, it was again carefully translated by an interpreter to Barbara and explained to her. If such settlement can be overturned for fraud, then no settlement made with one unfamiliar with the English language can stand; for it is always possible for such an one to say that he did not understand what the interpreter said. Moreover, the settlement was not so grossly inequitable as to indicate fraud or overreaching. The boys to whom the conveyances were made, after, as well as before, reaching majority, remained at home and worked for their parents without other consideration than their board and spending money. Barbara brought nothing to her husband when she married him, and there is every reason to believe that she did not enter into the marriage to secure her husband's property. She felt kindly disposed toward his children, and they bore her no ill will. The annuities were fixed on the basis of $1.50 per acre rental value of the land, and it is shown that it was the intention of the father, when some of the land was procured, that it should go to his sons. The amount paid to Barbara, and what she will receive until her death, will give her a good living until that time; and she has never had any children of her own. She is, and was, of that type of mind easily satisfied, provided she was assured of a comfortable living until her death.

We are convinced, after a careful study of the record, that Barbara is concluded by this settlement and the decrees entered thereon, and that they should stand.

It follows that the decree below must be, and it is, reversed, and the cause is remanded for an order dismissing the petitions, and affirming and confirming the judgments and decrees sought to be set aside.—*Reversed and remanded.*

WEAVER, EVANS and PRESTON, JJ., concur.